# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MONIQUE STEWART,

                **Plaintiff,**

     vs.                                 **Case No. 03-C-375**

JO ANNE BARNHART,
**Commissioner of Social Security,**

                **Defendant.**

---

# DECISION AND ORDER

---

       Plaintiff Monique Stewart ("Stewart") commenced this action pursuant to 42 U.S.C. § 405(g). She seeks judicial review of the final decision of Jo Anne Barnhart, the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI").

*Standard of Review*

       The Social Security Act limits the scope of judicial review, providing that the agency's findings of fact are conclusive so long as substantial evidence supports them and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001)(citing 42 U.S.C. § 405(g)). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must "build a logical bridge from the evidence to his conclusion," *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002), and "must confront the evidence that does not support his

conclusion and explain why it was rejected," *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004), but he need not "provide a 'complete written evaluation of every piece of testimony and evidence.'" *Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005) (quoting *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995)). The Court will "conduct a critical review of the evidence," considering both the evidence that supports, as well as the evidence that detracts from the Commissioner's decision, whose "decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Briscoe v. Barnhart*, No. 04-2251, slip op. at 7-8 (7th Cir. Sept. 23, 2005) (citations omitted).

### Regulatory Framework

To determine disability, the ALJ makes a five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy. *Dixon*, 270 F.3d at 1176; 20 C.F.R. § 416.920(a)-(f). The process is sequential, and if the ALJ can make a conclusive finding at any step that the claimant is or is not disabled, she need not progress to the next step. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The claimant bears the burden of proof at steps one through four, after which, at step five, the burden shifts to the Commissioner. *Id*. at 1000. A finding of disability requires an affirmative answer at either step three or step five. *Id*.

*Background*

Stewart filed an application for SSI with a December 19, 2000, protective filing date, alleging that she became disabled as of June 1, 1995, because she was unable to "think straight," and could not work or "get along" with people. (Tr. 132-37.) Her claim was denied, initially and upon reconsideration. At Stewart's request, an Administrative Law Judge ("ALJ") conducted a hearing on January 8, 2003. Stewart, represented by counsel, appeared and testified. (Tr. 31.) Vocational expert, Richard Willette ("Willette"), also appeared and testified. (*Id*.)

On May 23, 2003, the ALJ issued a decision finding that Stewart, who was not engaged in substantial gainful work activity, had severe mental retardation, but did not have an impairment or combination of impairments listed in, or medically equal to one listed in, the Listing of Impairments. (Tr. 16.) The ALJ found that when Stewart's subjective complaints and allegations about her limitations and impairments were considered in light of the objective medical evidence as well as the record as a whole, they did not reflect an individual who is so impaired as to be incapable of engaging in any substantial gainful work activity. Determining that Stewart had the residual functional capacity to perform simple, routine, unskilled work at all exertional levels, and had no past relevant work, the ALJ found that, considering Stewart's age, education, work experience and residual functional capacity, in light of the testimony of the vocational expert, there were a significant number of jobs that Stewart could perform. (The ALJ cited medium, light and sedentary assembler and packaging jobs and medium and light packager/filler jobs identified by the vocational expert). Therefore, the ALJ concluded that Stewart was not under a "disability" as defined in the Social Security Act.

*Medical Evidence*

Stewart was treated at the St. Joseph's Hospital emergency room ("St. Joseph's ER"), for abdominal pain on October 6, 1999. (Tr. 236-46.) An acute urinary tract infection was diagnosed and a 10-day course of Bactrin was prescribed. (Tr. 246.)

Stewart also was seen at the St. Joseph's ER on October 23, 2000, due to an abscess, which had recently become larger and painful, on her left buttock cheek. (Tr. 231, 234.) Keflex (an antibiotic) and Ultram (a pain reliever) were prescribed. (Tr. 233-34.) Stewart was also instructed to apply warm compresses. (Tr. 231.)

On December 3, 2000, Stewart was again seen at the St. Joseph's ER for swelling and tenderness in her left axillary and chest area. (Tr. 224.) She refused IM (intramuscular) antibiotics and analgesics. (Tr. 225.) Motrin (also known as ibuprofen – a nonsteroidal anti-inflammatory drug ("NSAID")); Vicodin (narcotic analgesic; e.g., a pain reliever); and Keflex were prescribed. (Tr. 225.)

Another visit to the St. Joseph's ER on January 28, 2001, was precipitated by complaints of bilateral flank and back pain for two days. (Tr. 209.) Stewart was diagnosed with having left thoracolumbar strain. (Tr. 206.) Neurological review did not disclose any changes in gait, any numbness and tingling, any motor changes, any sensory changes, or any sweating. (Tr. 206.) Stewart's condition improved with an injection of Toradol, a NSAID. (Tr. 205, 208.) Motrin was prescribed and Stewart was instructed to follow-up the treatment with the Community Clinic. (Tr. 205.)

City of Milwaukee Police Department prisoner medical intake screening reports dated October 5, 2000, and February 13, 2001, indicate that Stewart reported taking medication for asthma.[1] (Tr. 272, 275.)

Thomas Lehman, Ph.D., ("Lehman") performed a consultative examination of Stewart on May 2, 2001, with regard to her disability claim. (Tr. 276-303.) As her chief complaint, Stewart stated: "I don't get along with people. I can't work with people. I get mad too quick." (Tr. 276.) Lehman found that Stewart had a "temper and anger problem" and was cognitively disabled. (*Id*.) He did not believe that Stewart was a malingerer. (*Id*.)

Lehman reported that, on the morning of the scheduled appointment, after he had telephoned Stewart to remind her about the appointment with him, she called back to ask whether it would be permissible if she came alone; over the phone line, Lehman could hear Stewart arguing with her mother, "complete with swearing and cursing." (*Id*.) Lehman indicated Stewart could come alone. (*Id*.) Stewart arrived unaccompanied, 10 minutes late for the appointment. (*Id*.)

During the interview, Stewart described her mother as an angry alcoholic. (*Id*.) Stewart had five sisters and three brothers and reported that her youngest sister was 17 and that she (Stewart) was the second youngest. (*Id*.) Stewart also stated that she and her siblings had three different fathers – the oldest siblings had the same father, she had a different father and the two youngest had a third father. (Tr. 277.) Lehman noted that there was an inconsistency in

---

[1]The record also includes a Milwaukee Country Jail Initial Screening Form completed and signed on February 13, 2001, for a black female, Monique Stewart, with the date of birth "10-06-68," indicating that she had asthma and was taking prescribed medication of yellow "MDF." (Tr. 271.)

Stewart's report that she was the second youngest child, and that the two youngest children had the same father. (*Id*.) Stewart reported that the father of her younger brother and sister, has custody of them and that she rarely saw her siblings. (Tr. 278.)

Stewart stated that she was "kicked out of" every school she attended. She did not attend special education classes. (*Id*.) She finished the eighth grade in the Milwaukee Public Schools with a 2.5 grade point average. (*Id*.) Stewart had no medical care at the time of Lehman's examination, no military history, and no psychological history. (*Id*.) Her work history was limited to one month of working at a McDonald's restaurant and working two weeks in 2000 as a cashier at Checkers, a fast food venue. (*Id*.)

Lehman described Stewart's hygiene and grooming as below average. (Tr. 278.) She smelled of cigarettes, and her T-shirt, blue jeans, and fingernails were dirty. (Tr. 278.) Lehman reported that Stewart spoke simply but coherently, and was both pleasant and cooperative during the examination. (*Id*.) She maintained adequate eye contact and rapport during the examination was judged to be good. (*Id*.)

Stewart reported that she had a "'rough childhood'" and that she "was unable and [continued to be] unable to do the things that everyone else does." (Tr. 277.) Stewart stated that "she wants to have her way and finds herself constantly angry because she cannot have her way." (*Id*.) She reported physical and sexual abuse, stating that one of her mother's boyfriends used to beat up both her and her mother. (*Id*.) Stewart also stated that her mother had little awareness because she was constantly inebriated. (*Id*.)

–6–

Stewart stated that she typically retired for the night at 10:30 p.m., but was fearful at night and slept with the lights on. (*Id*.) She preferred to sleep during the day, during which she slept several hours. (*Id*.)

Stewart reported that she resided with her mother, her mother's current boyfriend and her mother's boyfriend's cousin. (*Id*.) Stewart stated that she and her mother constantly fought and argued, and swore at each other. (Tr. 277-78.) When asked about her residence, Stewart called it "The Hell House," and said she lived in the attic. (Tr. 278.)

Stewart reported that she did not go anywhere except the store. (Tr. 277.) She had not been to a movie, bowling or to a mall for a long time. (*Id*.) In describing her days, Stewart reported that sometimes she got up at 6:30 a.m., she turned on the television or music, washed up, and did little other than smoke; sometimes she slept all day, sometimes she sat on the porch or went to the store. (*Id*.) She did her own laundry and took out the garbage. (*Id*.) Stewart said that her mother sometimes cooked when she was not drunk; Stewart did no cooking. (*Id*.) Stewart knew how to use the public transit system and rode the bus to her examination. (*Id*.) Stewart reported that she did not want a boyfriend, that she had a friend or two but she spent little time with them. (*Id*.)

Stewart denied using alcohol or drugs and stated she was not taking prescription medications. (Tr. 278.) She smoked a pack of cigarettes a day. (*Id*.)

Testing revealed a standard score of 65 on the reading subtest of the Wide Range Achievement Test-III, placing Stewart in the first percentile with a raw reading score of 29 – equivalent to the 3rd grade reading level. Her general fund of knowledge was quite limited and

she could do simple addition and subtraction but not multiplication or division. (Tr. 279.) Stewart demonstrated concrete thinking skills and limited practical judgment. (Tr. 279.) Lehman opined that Stewart neither exaggerated nor minimized her symptoms, activities, and lifestyle. (Tr. 278.) Stewart reported a variable appetite, sometimes eating only one meal a day or none at all. (Tr. 279).

Lehman diagnosed an impulse control disorder not otherwise specified with occasional angry outbursts, mild mental retardation with Full Scale Intelligence Quotient ("IQ") of 65 and a Verbal IQ of 67 as measured by the Wechsler Adult Intelligence Scale - 3rd Edition, and a general medical complaint of reduced hearing acuity of her left ear. (Tr. 280-81.) Lehman noted that Stewart had severe psycho-social stressors of a severe estranged mother, no contact with her biological father, a history of physical and sexual abuse, no skills, no interests, poverty, and no access to health care. (Tr. 281.) His global assessment functioning ("GAF") was rated as 42, serious.[2] (Tr. 281.) Lehman found that Stewart has difficulty remembering, limited ability to respond appropriately to supervisors or coworkers, adequate concentration and attention, but limited ability to withstand the stress of a workday or adapt to routine changes in the workday. (Tr. 281.)

On September 28, 2001, Stewart was seen at the St. Joseph's ER for complaints of left ear pain, nasal congestion and a sore throat. (Tr. 222.)

---

[2]This is an overall rating of psychological functioning used in the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") at 32 (Am. Psychiatric Ass'n. 4th ed. 2000). A GAF of 50 to 41 corresponds with "Serious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) **OR any serious impairment in social, occupational or school functioning** (e.g., no friends, unable to keep a job)." *Id.*

Case 2:03-cv-00745-RTR   Filed 09/30/05   Page 8 of 24   Document 28

On October 31, 2001, Stewart visited the St. Joseph's ER for complaints of right ear pain with decreased hearing of two days duration. (Tr. 212, 216.) She was prescribed Biaxin (a macrolide antibiotic which fights bacteria) BID (twice daily) for seven days, and over-the-counter medications, a decongestant (Sudafed or Dimatapp) and a NSAID (Advil). (Tr. 215.)

Stewart's medical records were reviewed and evaluated by two non-examining medical consultants. Robert Hodes, Ph.D., completed a Mental Residual Functional Capacity Assessment form and Psychiatric Review Technique form ("PRTF") on July 3, 2001. (Tr. 304-21.) He evaluated borderline intelligence, and impulse control disorder and depression. (Tr. 304). Arden Mahlberg, Ph.D., evaluated Stewart's borderline intelligence, impulse control disorder, not otherwise specified, "probable" depressive disorder, not otherwise specified, in a Mental Residual Functional Capacity Assessment form and a PRTF form on August 21, 2001. (Tr. 326-339.) Both Hodes and Mahlberg concluded that Stewart's impairments did not meet or equal the listing of impairments. (Tr. 98-99, 175-79.)

*Hearing Testimony*

Stewart testified that she was about 5'5" tall, weighed about 167 pounds[3] and lived with her mother. (Tr. 38). She said living with her mother was difficult; they argued a great deal because her mother drank and smoked drugs.[4] (Tr. 61-62.) In addition, Stewart resented her mother's neglectful treatment. (Tr. 61-62.) In conflict with respect to her residence, Stewart also testified that, she moved from her mother's home when she was 16-years-old and, since then, had

---

[3]She stated her usual weight was 156 pounds and she had no explanation for her weight fluctuation. (Tr. 38.)

[4]As noted by the ALJ, Stewart's testimony about where she resided was contradictory. (Tr. 15.) The ALJ also noted that Stewart was very evasive during the hearing. (*Id.*)

Case 2:03-cv-00745-RTR    Filed 09/30/05    Page 9 of 24    Document 28

lived with a girlfriend in a home about five blocks away from her mother's residence. (Tr. 65-67, 69-70.) Stewart kept her clothes and her possessions at her mother's home and ate there if her mother had cooked. (Tr. 66, 70.) When Stewart's boyfriend was in town, Stewart also slept at the home of her boyfriend's uncle. (Tr. 71.) She maintained relationships with her boyfriend, his uncle, the female friend with whom she lived, and the female who provided her with her marijuana to smoke. (Tr. 75.)

Because she was involved in physical fights with another girl, Stewart was expelled from school. (Tr. 55.) Prior to that, she was sent home from school about 10 to 12 times. (Tr. 55.) She completed ninth grade. (Tr. 55.)

For about one and one-half months around August 2002, Stewart took two hour classes five days a week at the OIC ("Opportunities Industrialization Center of Greater Milwaukee") for a General Educational Development ("GED") diploma. (Tr. 39.) She also studied at OIC for a GED in 2001. (Tr. 54.) She did not receive her GED because she needed to take a pre-GED test at MATC ("Milwaukee Area Technical College") and had not yet done so. (Tr. 65.) She was not able to read the newspaper or magazines. (Tr. 57.)

Stewart last worked in February of 2002 as a cashier at Kohl's grocery store. (Tr. 40, 55.) She was fired after two weeks for working too slowly. (Tr. 40.) At the time of the hearing, Stewart's sole source of support was food stamps. (Tr. 43.) Sometimes, she did not visit the doctor because she did not have a medical card. (Tr. 58.)

She testified that the preceding year she had received emergency room treatment for a boil under her arm. (Tr. 43.) She experienced pain in her thighs and the lower part of her

back, and her thighs hurt when she walks excessively. (Tr. 44). For pain relief, she sat down, or laid down and slept. (Tr. 44.)

Stewart estimated that she experienced back pain if she carried items weighing more than about 70 pounds. (Tr. 44.) She stated that she could stand for an hour; sit for 45 minutes; could lift, pick up, and carry 40 to 50 pounds; could not bend or stoop; could sometimes climb steps; and could use her hands without limitation. (Tr. 52.)

From February to March 2002, Stewart was in jail serving a sentence for a misdemeanor shoplifting conviction. (Tr. 52.) In October 2000, she was also incarcerated for retail theft. (Tr. 53.) She paid $65.00 in connection with October 2000 charge, but was not convicted. (Tr. 53.)

Stewart testified she was taking six or seven prescription medications, but said that they had long names. (Tr. 45.) She then stated that most of the medications were prescribed for the infection in her arm the preceding year and that she had been told to take the medications until they were gone. (Tr. 45.) However, she had not taken them regularly as prescribed. (Tr. 45.) She stated she had refilled those medications (Tr. 45.), but, she also testified that she had not returned to the St. Joseph's ER since October 2002. (Tr. 48.) She had last seen a doctor in November 2002 for a routine gynecological examination. (Tr. 46.) Upon further questioning, Stewart testified that she last took the prescription medications during August 2002. (Tr. 59.) Stewart also testified that she did not really have problems with asthma. (Tr. 56.)

Stewart testified that she spends her time sitting around the house watching television or talking on the telephone, walking down the street or, once or twice a week, walking

to a friend's house.  (Tr. 48-51.)  She takes care of her personal hygiene and dresses herself.  (Tr. 49.)  She does not cook, wash laundry, clean, or do yard work.  (Tr. 49.)  She does not attend church or participate in religious activity.  (Tr. 50.)  She goes to the grocery store with a sibling.  (Tr. 68.)  To attend the hearing, Stewart and her mother took the bus.  (Tr. 50.)

Stewart testified that the information provided by her mother about her activities on a questionnaire (*see* Tr. 159) was incorrect and that Stewart does not drive, clean house, do yard work, mow grass, or shovel snow.  (Tr. 59-60.)  Stewart also testified she and her mother each completed part of the daily activities questionnaire (Tr. 150-55), and that when they completed it, Stewart was trying to obtain readmission to public school.  (Tr. 63-63.)  Stewart stated that, contrary to the information on the form, she did not cook, drive a car,  play cards, or attend sporting events; she had no  hobbies; she did not engage in volunteer activities; she did not pay bills or handle her finances, dine out, or attend movies.  (Tr. 63-64.)  Upon subsequent questioning by the ALJ, Stewart stated she sometimes makes vegetable soup and noodles.  (Tr. 68.)

Two or three times a month, Stewart smokes a twenty-dollar sack of marijuana provided by a friend.  (Tr. 50-51.)  But, she also testified that  sometimes she did not smoke marijuana  for a month or two.  (Tr. 61.)  She learned how to drive as a teenager but no longer drives and questioned her ability to do so.  (Tr. 53.)

Vocational expert Willette testified that for a 21-year-old individual, with a ninth grade education, vocational history, no exertional limitation, and the ability to perform routine repetitive work, follow simple non-complex instructions, and do unskilled work, there would be

a total of 49,000 assembly jobs available in Wisconsin – 6,000 of those jobs would be at the sedentary level; 27,000 of those jobs would be at the light level; and, 11,000 of those jobs would be at the medium level. (Tr. 78.) He also identified hand packaging jobs – 143 sedentary jobs; 7,400 light jobs; and, 4,500 medium jobs. (Tr. 78.) Further, he indicated 5,000 packaging and filing jobs would be available at the light level and 1,900 jobs would be available at the medium level. (Tr. 78.) The number of such jobs would not be reduced if an additional limitation of limited or no contact with the public was added. (Tr. 79.) If the limitation of limited interaction with co-workers was added to the hypothetical situation, then the number of available jobs would be reduced by 50%. (Tr. 79.) Willette also testified that if the individual's academic achievement was in the lowest 1% of the population, there could be some impact on the number of available jobs but Willette did not have any supporting figures on the issue. (Tr. 84-85.) Willette also testified that angry outbursts in the work place, such as arguing with co-workers or supervisors, are the type of behavior that would usually result in disciplinary action. (Tr. 86.) Counsel for Stewart questioned Willette about the sources of his information and objected to his reliance upon *Unskilled Employment Quarterly*. (Tr. 80-83, 88-96.) The ALJ overruled counsel's objection, but gave him an opportunity to make additional submissions. (Tr. 91, 96.)

*Analysis*

Stewart contends that the ALJ did not properly evaluate her mental impairments and did not properly consider § 12.05(C) of the Listing of Impairments for mental retardation contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. She also contends that the ALJ did not issue a proper credibility determination and that the ALJ erred in evaluating Stewart's residual

functional capacity. Further, Stewart maintains that the ALJ's reliance upon vocational testimony was not supported by substantial evidence.

*Evaluation of Mental Impairments*

Stewart contends that the ALJ improperly evaluated her mental impairments because she did not find that Stewart suffers from an impulse control disorder and depression. She also asserts that the ALJ improperly equated the alleged lack of medical treatment with the absence of a second impairment.

The purpose of step two of the disability inquiry is to require plaintiffs to initially make a threshold showing of severity. *Bowen v. Yuckert*, 482 U.S. 137, 145 (1987). Plaintiffs who are unable to show that their impairments significantly limit their ability to do most jobs are to be screened out of the disability determination process. *Id*. at 148. Rejection of a plaintiff's application at step two is to be applied only in those situations where a plaintiff is unable to make a "de minimus" showing of a severe impairment. *Id*. at 154. The plaintiff bears the responsibility of providing medical evidence of a mental impairment. *See Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991.) The diagnosis of an impairment is not tantamount to a finding of disability. *See Estok v. Apfel*, 152 F.3d 636, 639 (7th Cir. 1998); *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987).

The ALJ found that Stewart's mental retardation is "severe," but she "has no physical or other impairment imposing additional and significant work related impairment of function." (Tr. 14.) The ALJ referred to Lehman's diagnosis of an impulse control disorder. (Tr. 15.) She discounted the diagnosis noting that Stewart did not receive regular or consistent

psychiatric treatment and was able to "get along" with others. (Tr. 15.) The ALJ also noted that Stewart had maintained a relationship of nearly two years with her boyfriend. (Tr. 15.) The ALJ adequately addressed Stewart's impulse disorder and reasonably found that it was not a severe impairment.

Stewart on appeal also maintains that she had depression – she did not argue that before the ALJ. (Tr. 36-37, 112-114.)[5] Lehman did not diagnose depression. (See Tr. 281.) Non-examining medical consultant, Mahlberg, reported "probable depressive" disorder - not otherwise specified, noting that there were some signs of depression, citing anhedonia (loss of pleasure), decreased energy, feelings of worthlessness, irritability and crying. ( Tr. 329, 324.) Hodes also considered depression as a factor in Stewart's claim. While the ALJ did not expressly mention Mahlberg's and Hodes' assessments of depression, she indicated that she considered their reports, which previously evaluated these issues, but did not have the benefit of some of the evidence presented at the hearing. (See Tr. 14.) A reading of the ALJ's decision as a whole reveals that in evaluating Stewart's disability claim, the minimal medical treatment and evaluation Stewart received was noted along with other relevant factors and that the ALJ adequately articulated her consideration of Stewart's impairments.

Mental retardation is not a condition that in and of itself necessitates medical treatment. *See Guzman v. Bowen*, 810 F.2d 273, 275 (7th Cir. 1986) (The social security

---

[5]The bases for Stewart's disability claim were broadly worded – an inability to think straight and not getting along with others. However, Stewart did not assert at any time before the ALJ that she was depressed or met the mental retardation listing of impairments, in part, due to depression, which means that she has probably forfeited this issue. *See Kepple v. Massanari*, 268 F.3d 513, 516-17 (7th Cir. 2001) (suggesting but not deciding that claimant waives an issue by failing to raise it during administrative hearing). In any event, even if she has not waived the issue, the record is insufficient to establish that Stewart suffered any disabling limitations as a result of depression.

disability regulations "expressly define mental retardation as denoting a lifelong condition." )

Regardless of the lack of medical treatment or evaluation, the ALJ found that Stewart had a severe mental impairment in the form of mental retardation. (Tr. 14.)

Section 12.05(C) of the Listing of Impairments requires: "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05(C). The ALJ found that Stewart's IQ of 65[6] satisfies the initial requirement of the Listing of Impairments for mental retardation. However, she concluded that Stewart did not meet or equal §12.05(C) of the Listing of Impairments, stating that she was relying on the opinions of those who previously evaluated such issues. (Tr. 14.) She stated that she had carefully considered the Listing of Impairments for mental retardation, but that Stewart had "no other physical or mental impairments imposing additional and significant work related limitation of function." (Tr. 14.)

The ALJ's finding is supported by the medical record which indicates that Stewart's medical treatment is limited to acute problems – a urinary tract infection, skin infections or abscesses, problems associated with colds, and a back strain. The ALJ made note of that fact. (Tr. 15.) The mental residual functional capacity assessment forms and PRTFs, to which the ALJ refers generally, but without specific citation, also support her determination that Stewart does not satisfy the requirements of Listing of Impairments. (*See* Tr. 304-339). Those evaluations

---

[6]Lehman rated the degree of Stewart's mental retardation as 317 under the *DSM-IV*. (Tr. 281.) The *DSM-IV* at 253 states "During their adult years, [members of this group] usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. (Tr. 253.) With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or with community supports." (Tr. 253.)

took into account Stewart's mild mental retardation, impulse control disorder and depression. (*See* Tr. 304, 308, 311-12, 315, 322, 324, 326, 329, 330, 333.)

In addition to the medical evidence, the ALJ noted that Stewart attended the examination with Lehman alone and took the city bus to the examination alone. Stewart also manages her own food stamps. Further, noted the ALJ, Stewart was well-groomed at the hearing. The ALJ also observed that, although Stewart has an impulse control disorder, she has maintained relationships with others. That finding is consistent with the facts that Stewart often spends time at a girlfriend's house, is supplied with marijuana at no cost by another girlfriend, has a boyfriend, and is welcomed at her boyfriend's uncle's home. These facts provide substantial evidence to support the ALJ's finding that Stewart does not have any other physical or mental impairments imposing additional and significant work-related limitation of function and thus does not have an impairment which meets or equals the Listing of Impairments.

*Credibility Finding*

Stewart also asserts that the ALJ did not comply with Social Security Ruling ("SSR") 96-7p,[7] 1996 WL 374186, which sets forth criteria for the evaluation of credibility. Social security rulings are binding on the Commissioner. *See Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991).

Here, the ALJ did not cite SSR 96-7p, but she did note the factors that must be considered under that ruling. (*See* Tr. 14, ¶ 4.) She discussed Stewart's daily activities, the nature of Stewart's subjective complaints, factors that aggravated the symptoms, any medications Stewart took, treatment which Stewart received, inconsistencies in Stewart's testimony and the

---

[7]Social Security Ruling 96-7p states:

In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

1996 WL 374186, at *4.

Case 2:03-cv-00745-RTR   Filed 09/30/05   Page 18 of 24   Document 28

reports to DDS worker.  (Tr. 14-15.)  The ALJ noted that Stewart's temper and anger difficulty arose in the context of her "chaotic family upbringing" and was found by Lehman to be "quite relational in nature." (Tr. 13.)  Stewart also was not placed in special education classes. (Tr. 13.) The ALJ also took into account Stewart's participation in GED classes for two months in 2001. (Tr. 15.)  She noted that Stewart had friends and a relationship with a boyfriend for two years. (Tr. 15.)  She found that Stewart had managed her life independently since she was a teenager. (Tr. 15.)  The ALJ also considered the absence of any psychiatric treatment. (Tr. 15.)  The ALJ also noted that Stewart had a misdemeanor shoplifting conviction. (Tr. 15.)  The ALJ's decision adequately tracks the relevant considerations in assessing Stewart's credibility.

The ALJ determined that when Stewart's complaints are considered in light of all the objective medical evidence as well as the record as a whole, they do not reflect an individual who is so impaired as to be incapable of engaging in any substantial gainful activity.  (Tr. 16.) An ALJ's credibility determination is due special deference, *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004), and will not be overturned unless it is "patently wrong" and not supported by the record.  *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004).  The ALJ's credibility determination satisfies this standard and is upheld.

*Residual Functional Capacity Determination*

Stewart states that rather than providing the function-by-function residual functional capacity assessment required by SSR 96-8p,[8] the ALJ "painted with a broad brush, calling for simple and routine work at any exertional level."[9]  (Pl.'s Br. at 11.)

Stewart states that the terms "simple" and "routine" were not defined for the vocational expert and are vague in the context of her residual functional capacity.  This contention is not supported by the record.  The ALJ asked the vocational expert to address the

---

[8]Social Security Ruling 96-8p, 1996 WL 374184, at **3,7, states:

> The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

> Symptoms. In all cases in which symptoms, such as pain, are alleged, the RFC assessment must:

> > * Contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;

> > * Include a resolution of any inconsistencies in the evidence as a whole; and

> > * Set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.

> The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.  In instances in which the adjudicator has observed the individual, he or she is not free to accept or reject that individual's complaints solely on the basis of such personal observations.

[9]Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling.

SSR 96-8p, 1996 WL 374184, at *5.  The ALJ found that Stewart could do work at all exertional levels; that is, she had no exertional limitations.

availability of jobs for an individual with no exertional limitations and who was "able to perform routine repetitive work, follow simple non-complex instructions, and do unskilled work." (Tr. 78). These terms were described for the vocational expert. Moreover, the terms are not novel in social security disability cases. *See Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (upholding finding of residual functional capacity for low stress repetitive work); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) (upholding finding of residual functional capacity for simple unskilled low stress work). Therefore, the ALJ's residual functional capacity assessment stands.

### Vocational Testimony

Stewart maintains that a remand is necessary because she challenged the reliability of the vocational expert's testimony at the administrative level and the ALJ did not discuss that challenge in her decision. She states that the Court cannot determine on the current record whether the vocational witness was an "expert" who gave reliable testimony. Stewart also asserts that the ALJ's reliance on the vocational testimony was not in compliance with SSR 00-4p.[10]

---

[10] In relevant part, SSR 00-4p states:

Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

2000 WL 1898704, at *2.

Case 2:03-cv-00745-RTR   Filed 09/30/05   Page 21 of 24   Document 28

At the hearing, at the request of Stewart's attorney, Willette identified his data source as the *Employment Statistics Quarterly*, published by the U.S. Publishing Company on December 29, 2002, and the *Job Quest* computer program. (Tr. 80.) Willette also stated he had been a vocational expert for 10 or 15 years, had expertise in the field by working with and placing people, and had used a variety of statistics. (Tr. 81.) Stewart (through counsel) challenged the *Employment Statistics Quarterly* source. (Tr. 82-83, 88-91.) The ALJ overruled the objection, stating that she was giving the vocational expert the benefit of the doubt and would afford "some weight" to the vocational expert's opinion. (Tr. 91-92.) Upon further probing, Willette provided three numeric codes for the positions he identified as being available to Stewart. (Tr. 93-94.)

By subsequent written submission submitted with leave of the ALJ, (Tr. 96), Stewart's counsel further challenged the jobs identified by Willette on the ground that he did not use a reliable methodology to determine the number of jobs available for a person with Stewart's vocational profile and the information he used was inconsistent with that in the *Dictionary of Occupational Titles*. (Tr. 114-17.) Stewart objected to Willette's testimony about the number of jobs that might exist in the job market unless Willette produced valid published data to support his testimony. (Tr. 116.) Before the Appeals Council, Stewart claimed error, in part, asserting that the ALJ failed to consider and rule on Stewart's objections to Willette's testimony and relied upon the vocational testimony without consideration of the reliability of that testimony. (Tr. 7.)

In *Donahue v. Barnhart*, 279 F.3d 441, 445-46 (7th Cir. 2002), cited by Stewart, the court of appeals addressed situations when a vocational expert's testimony conflicts with

information in the United States Department of Labor's *Dictionary of Occupational Titles* (*DOT*).
The court stated:

> The Dictionary is published by the Department of Labor as a tool; it does not purport to contain rules of law, and no statute or regulation gives it binding force. The Commissioner of Social Security is entitled to examine independently those questions covered by the Dictionary – something that the Dictionary itself proclaims when observing that users should rely on better data if they have any in their own possession. See *Dictionary* at xiii.

*Donahue*, 279 F.3d at 445-46. The ALJ, through the vocational expert, may use other sources of information. *Id*. at 446. However, *Donahue* also instructs that if the basis of the vocational expert's conclusion is questioned at the hearing, then the ALJ should make an inquiry to find out whether the vocational expert's conclusions are reliable. *Id*. at 447. Although it did not elaborate, the court of appeals suggested that the inquiry should be similar, but not identical, to that conducted under Rule 702 of the Federal Rules of Evidence. *Id*.

The ALJ made an inquiry at the hearing regarding the basis of the vocational expert's testimony and concluded that it was sufficiently reliable. Stewart expanded on her objection to that testimony, pointing out conflicts between Willette's testimony and the DOT.

Having given Stewart the opportunity to supplement her submissions after the hearing, it became incumbent upon the ALJ to revisit the issue as to whether Willette used a reliable methodology to determine the number of jobs available for a person with Stewart's vocational profile and the claimed inconsistency of information Willette used and that of the *DOT*. *See Id*.; *see also,* SSR 00-4p. The issue was not re-addressed by the ALJ. Absent the ALJ's resolution of Stewart's challenges to Willette's testimony, this Court cannot determine if

substantial evidence exists to support the ALJ's conclusion at step five of the sequential analysis for disability claims that Stewart is not disabled because there are a significant number of jobs available to her which she can perform, given her residual functional capacity and other relevant vocational factors.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

Stewart's appeal is **GRANTED** pursuant to sentence four of 42 U.S.C. § 405(g).

The Commissioner's final determination that Stewart is not disabled based on her application for supplemental security income with a December 19, 2000, protective filing date is **REVERSED** and this matter is **REMANDED** to the Commissioner for further proceedings consistent with this opinion, and this action is **DISMISSED**.

The Clerk of Court **SHALL** enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 30th day of September, 2005.

**BY THE COURT**

**s/ Rudolph T. Randa**
**Hon. Rudolph T. Randa**
**Chief Judge**